BERNIECE AMELIA KOBUSCH, Appellant, v. THE RUBEROID COMPANY, a New Jersey Corporation, and JAMES REID.—No. 39609.—194 S. W. (2d) 911.

Division Two, April 30, 1946.

Rehearing Denied, June 10, 1946.

*Wm. R. Schneider* and *Walther, Hecker & Walther* for appellant.

*John L. Harlan* and *Wilton D. Chapman* for respondents.

TIPTON, J.—This is an action for damages for the wrongful death of appellant's husband, Earl Smith, resulting from injuries received when he was struck by a crane operated by respondent Reid who was employed by respondent Ruberoid Company. At the close of appellant's evidence, the circuit court of the City of St. Louis directed a verdict for respondents.

The facts as shown by the record are that Charles F. Klein had a contract with respondent Ruberoid Company to paint the interior of a building used by that company. In this building were several electric cranes used to transfer heavy material from department to department. Appellant's husband, Earl Smith, and Thomas Donnelly were working for Klein painting the interior of the plant and had been working there for four or five weeks.

On February 23, 1942, Smith and Donnelly arrived at the plant about 7:45 A. M. and changed into their overalls. At 8:00 A. M. they started mixing their paints and at about 8:10 A. M. started over to the ladder leading to the platform from whence they would climb to the beams on which they intended to work. The ladder was attached to a large "I" beam which ran vertically from the floor to the roof of the building. The ladder was attached to the east side of the "I" beam and was made of iron. Some distance above the floor, estimated by the witnesses to be from twenty-five to forty feet, a large electric crane operated from one end of the plant to the other.

This crane was about seventy or seventy-five feet in length and twelve feet wide. On either end of the crane were two wheels which ran on a track or rail. The operator of the crane stood in a cab, the floor of which was about seven feet lower than the crane tracks. The stationary ladder up which Smith and Donnelly climbed in order to get to the place where they were working was located on the east side of the "I" beam and went up to the west rail. At the level of the west rail and just to the west of it, extending northward from the "I" beam, was a platform or catwalk about five feet wide. In order to go onto the platform or catwalk the men had to cross or step over the west rail on which the crane operated. Smith and Donnelly stepped over the rail and onto this platform. They then proceeded to climb up to the place where they were working on the beams.

After they had been working on the beams for about ten or fifteen minutes they found that they needed their special brushes in order to get behind the beams. Smith went down from the beams to the platform or catwalk. In order to get down from this platform to the ground floor it was necessary for him to step across the west rail upon which the electric crane operated and climb down the stationary ladder attached to the "I" beam. He went down from the beams to the platform and from the platform started across the rail and down the ladder. Just as he started down the ladder he was struck by the crane which was proceeding from the north to the south. Smith died from the injuries which he received as a result of being struck by the crane.

Only three witnesses testified in this case. They were Thomas Donnelly, James Reid and appellant. Essential facts testified to by Donnelly were that about 8:10 A. M. he and Smith started over toward the ladder which was bolted to one of the large upright beams. Just before they got to the ladder and while still on the floor they saw the crane operator in the cab of the crane. Every morning he and Smith gave the crane operator the "high sign" by which witness meant that they would wave to the crane operator. On the morning of the accident they gave the crane operator the "high sign" and the crane operator waved back to them. At that time they were about twenty feet north of the ladder.

This witness stated that he and Smith climbed up the ladder to the platform and then went hand over hand until they had climbed up to where they were working which was about ten feet above the platform. After about ten or fifteen minutes Smith started down to the floor of the plant to get some short handled brushes needed for the particular work they were doing. Smith went west to the end of the "stringer" (a board twenty-two feet long) on which they were working and went down hand over hand onto the platform. After reaching the platform he turned to go down this ladder. He had one foot on the ladder and one foot on the platform when the crane came

from the north and struck him. Smith was facing south and when he first started down the ladder the crane was about twenty feet away. He further testified that he heard no bell or gong at the time but he immediately climbed down to where Smith was and by the time he got there the crane had backed up.

On cross-examination this witness testified that the crane was about ten feet away from Smith when he started to go down. He further testified as follows:

"Q. And did you sound any warning to Smith or call to him or yell at him or anything of that sort, to let him know this crane was coming toward him and only about ten feet away from him? A. No, sir.

"Q. You did not? A. No.

"Q. You could see the crane was moving? A. Yes, sir.

"Q. And there was nothing to obstruct your view of the crane, was there? A. No.

"Q. And there was nothing to obstruct Earl's view of the crane, was there? A. No.

"Q. Not a thing. And you and he, both, knew that this crane did operate along there and might operate along there at any time; isn't that true? A. Yes, sir.

"Q. In fact, you and he frequently discussed it and made it a practice of watching for it, didn't you? A. Yes, sir."

James Reid testified that he was the operator of the crane that ran into Smith; that although he had never tried to make an emergency stop, he thought one could be made in five or ten feet after allowing for "relaxing time"; that at the time of the accident he had picked up his material and started out to his department with the load; that he was watching down to see that nobody got under the material; that he at no time looked up to the place where the ladder crossed the crane rail; that as he was operating the crane it sounded like something went wrong with the motor; that he stopped the crane, crawled on top and saw Donnelly over the platform, and figuring something was wrong, moved the crane back and then went to where Smith and Donnelly were; and that he did not ring the bell during the thirty or forty feet in which he moved the crane prior to the accident.

On cross-examination Reid testified: "That load at that time that I picked up, I started to take it to my department, watching my work, that nobody got underneath this heavy load, . . ."

"Q. Did you know that Smith or anybody else was working above that morning at any time before this accident happened? A. No, sir." He further testified that he saw Smith about 8:30 A. M. that morning on the floor and did not know where Smith was going to paint that day; that they had not worked in that vicinity for at least two days before the accident; and that the last time he saw Smith working was on the cafeteria floor. He described the floor of

the busy department where the accident happened with its numerous machines and material, men working on the floor over which the crane had to lift the material, and the necessity of keeping his eyes on the floor so as not to carry a load over any man because it might slip from the chains and injure him. He stated, ''I was watching out for the safety of the people underneath me'' and that he did not know anybody was working on the beam and rafter that morning. He stated that when the crane was closer than fifteen or twenty feet from the ladder the angle of the beam and catwalk of the crane would obstruct his view of the top of the ladder.

Appellant did not know how the accident happened but testified only about her marital status and the funeral expenses.

Appellant contends that the evidence was sufficient to submit the case to the jury on three grounds of negligence: First, that respondents were negligent in failing to give decedent any warning of the approach of the crane; second, that respondent Ruberoid Company was negligent in maintaining a stationary ladder in such position so as to endanger the life and limb of persons required to use it; and third, under the humanitarian doctrine.

The above three grounds of negligence were pleaded in appellant's petition. Respondents' answer was a general denial and in addition thereto contained the following plea: ''And further answering they (defendants) aver and say that the injuries whereof plaintiff complains were caused by want of care and prudence by the deceased, and by and through his own negligence contributing thereto.'' The record fails to show any attack was made upon respondents' answer. It is true the plea of contributory negligence was general, but the rule in this State is that in the absence of attack thereon such a plea [914] of contributory negligence is good. See State ex rel. Shell Pet. Corp. v. Hostetter et al., 348 Mo. 841, 156 S. W. (2d) 673.

The only reasonable inference that may be drawn from the evidence is that the deceased did not look to see if the crane was approaching him as he was attempting to get on the ladder; in fact, the positive testimony of Donnelly is that ''he (deceased) was facing south'' while the crane was coming from the north. The record positively shows that as deceased was attempting to get on the ladder he could have looked north, south, east or west. Donnelly testified he saw the moving crane and that there was nothing to obstruct deceased's view of the crane; that both he and deceased knew that the ''crane did operate along there and might operate along there at any time''; and that he and deceased frequently discussed that fact and had made a practice of watching for it. Under these circumstances, the failure of the deceased to look for the moving crane contributed to his injuries and therefore appellant cannot recover for primary negligence of respondents. ''A failure on the part of a plaintiff, where a duty to look exists, to see what is plainly visible

when he looks, constitutes contributory negligence as a matter of law." Dempsey v. Horton, 337 Mo. 379, 84 S. W. (2d) 621, l. c. 625.

Appellant relies upon the rule of law "that in the absence of evidence to the contrary, the law will presume that the deceased was, at the time of the accident, in the exercise of ordinary care for his own safety, and that he was not guilty of negligence contributing to his death." McMenamy v. Scullin-Gallager Iron & Steel Co., 144 Mo. App. 707, l. c. 714, 130 S. W. 357. We find no fault with this rule of law but it has no application here because there was positive evidence that deceased did not look for the approaching crane. That case is not in point because deceased was killed on Sunday, a day when cranes were repaired and men were expected to be upon the crane track, while on the day the deceased in the case at bar was killed men were supposed to be on the floor and not on the beams and rafters.

Appellant also relies upon the case of Edsberg v. Baldwin Locomotive Works, 240 Pa. St. 614. In that case plaintiff went upon the crane track for the purpose of receiving some tools from an assistant and was struck by a crane, the operator of which knew that men were working above the track and admitted that if he had been looking he would have seen plaintiff in time to have stopped the crane. The facts in that case are entirely different from the facts of the case at bar. In the case at bar the crane operator did not know deceased and Donnelly were working above the track. He had not seen them there for the last two days and had last seen them working on the floor of the cafeteria.

Likewise, the case of Smale v. Wrought Washer Mfg. Co., 160 Wis. 331, is not in point for the reason that in that case it had been agreed upon by defendant that plaintiff should work on the track of the crane and that plaintiff would be notified by the craneman in case of danger.

We are constrained to hold that deceased was guilty of contributory negligence as a matter of law and that appellant cannot recover on the two grounds of primary negligence relied upon.

█ Did appellant make a submissible case under the humanitarian doctrine? Appellant contends that she did under the formula stated in the case of Banks v. Morris & Co., 302 Mo. 254, 257 S. W. 482, l. c. 484, which is as follows:

" '(1) Plaintiff was in a position of peril; (2) defendant had notice thereof (if it was the duty of defendant to have been on the lookout, constructive notice suffices); (3) defendant after receiving such notice had the present ability, with the means at hand, to have averted the impending injury without injury to himself or others; (4) he failed to exercise ordinary care to avert such impending injury; and (5) by reason thereof plaintiff was injured.' "

There can be no doubt that deceased was in a position of peril just before he ▆▆▆ was injured, but did respondents have either actual or constructive notice thereof?

Appellant's witness Reid testified:

"Q. . . . Now, where those men work is on that floor, isn't it A. Floor; yes, sir.

"Q. The men don't work up there on those beams and rafters, do they? A. No, sir.

"Q. Did you know that anybody in the world was working on those beams and rafters that morning? A. Help me God, I didn't."

He further testified: "I was watching out for the safety of the people underneath me." "To avoid taking a load over them, and in case anybody run in, I would ring my bell."

"Q. You wouldn't move a load over them even, would you? A. No, sir.

"Q. . . . The chains might slip and somebody might get hurt; is that right? A. Yes, sir."

Donnelly testified that at the time Smith was struck he could not see the operator of the crane in the cab.

There can be no doubt that Reid, the operator of the crane, did not see Smith in a position of peril before he was hurt, nor do we think under the evidence there was any duty to keep a lookout for anyone at the place where Smith was hurt. From the evidence the only reasonable inference is that men would only be working on the floor in the plant. We have ruled that sporadic use of a place does not constitute such a user of the place as to invoke the extended humanitarian rule as to discoverable peril. State ex rel. Brosnahan v. Shain et al., 344 Mo. 404, 126 S. W. (2d) 1193; Mayfield v. Kansas City Southern Ry. Co., 337 Mo. 79, 85 S. W. (2d) 116. Nor do we think the fact that Smith and Donnelly waved at the operator of the crane before they started to the place where they were going to paint would put the operator on notice that Smith would be at the place where he was hurt. The testimony shows that the building was a very large one with several departments and Smith and Donnelly had not worked in that department for at least two days before the accident; in fact, the last place the operator saw them working was on the cafeteria floor. Giving appellant every reasonable inference from the evidence, we do not believe the operator of the crane should anticipate that Smith would be on the crane track where he was hurt.

From what we have said, it follows the judgment of the trial court should be affirmed. It is so ordered. All concur.